NO. 23-11478-H

---

# IN THE UNITED STATES COURT OF APPEALS FOR THE ELEVENTH CIRCUIT

---

## DONALD LYONS AND JILLIAN LYONS
### PLAINTIFFS-APPELLANTS,

### v.

## SAEILO, INC. d/b/a KAHR ARMS,
### DEFENDANT-APPELLEE.

---

## APPEAL FROM THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION
## CASE NO. 5:21-cv-43-LCB

---

## BRIEF OF DONALD LYONS AND JILLIAN LYONS, PLAINTIFFS/APPELLANTS

**M. Todd Wheeles**
**Matthew Garmon**
**Nancy L. Eady**
**Morris, Haynes, Wheeles, Knowles & Hornsby**
**3500 Blue Lake Drive**
**Suite 200**
**Birmingham, Alabama 35243**
**(205) 324-4008**

**CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT**

**CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT**

Pursuant to 11th Cir. R. 26.1-1, undersigned counsel for Appellants, Donald and Jillian Lyons, certifies that the following persons have an interest in the outcome of this matter:

Burke, Liles C., United States District Court Judge;

Eady, Nancy L., Counsel for Donald and Jillian Lyons;

Garmon, Matthew G., Counsel for Donald and Jillian Lyons;

Kahr Arms, a subsidiary of Saeilo, Inc.;

Kahr Arms Sales, a subsidiary of Saeilo, Inc.;

Kahr Arms Factory, a subsidiary of Saeilo, Inc.;

Kinney, R. Warren, Counsel for Saeilo, Inc.;

Lyons, Donald, plaintiff;

Lyons, Jillian, plaintiff;

Malsch, Jeffrey, Counsel for Saeilo, Inc;

Moon, Justin, Owner and CEO of Saeilo, Inc.;

Morris Haynes, Attorneys at Law, law firm for Donald and Jillian Lyons;

Porter II, James W., Counsel for Saeilo, Inc.;

Porter, Porter & Hassinger, P.C., law firm for Saeilo, Inc.;

i

Renzulli, Christopher, Counsel for Saeilo, Inc.;

Renzulli Law Firm, law firm for Saeilo, Inc.;

Saeilo, Inc., defendant;

Saeilo Manufacturing Industries, a subsidiary of Saeilo, Inc.;

SMI Ca, Inc., a subsidiary of Saeilo, Inc.;

SMI Ma, Inc., a subsidiary of Saeilo, Inc;

Wheeles, M. Todd, Counsel for Donald and Jillian Lyons.

None of the corporations and businesses listed in this certificate are traded on any public exchange.

## <u>STATEMENT REGARDING ORAL ARGUMENT</u>

The Lyons request oral argument. This case is a products liability case involving a gun decided at the summary judgment level with an extensive record. There are contested factual issues that can best be explained in oral argument. Additionally, oral argument will enable counsel for the Lyons to use demonstrative aids to help the panel better understand the nature of the defect in the product and the arguments that support overturning the summary judgment.

**TABLE OF CONTENTS**

**Certificate of Interested Person and Corporation Disclosure Statement** .......... i

**Statement Regarding Oral Argument** ................................................. iii

**Table of Contents** ............................................................................iv

**Table of Authorities** ...................................................................... vi

**Statement of Jurisdiction** .............................................................. viii

**Statement of the Issues** .....................................................................1

**Statement of the Case** .......................................................................2

      A. **Course of the Proceedings** ...................................................2

      B. **Statement of Facts** ...............................................................4

          1. **The Incident** .................................................................4

          2. **A Description of the Kahr Firearm and Why It is Unsafe** ..........5

          3. **Evidence of Other Drop-Fires by Kahr Pistols** ........................12

      C. **The Standard of Review** ........................................................13

**Summary of the Argument** ..............................................................14

**Argument** .....................................................................................14

      A. **There is Substantial Evidence That the Kahr Pistol Was Unreasonably Dangerous When It Left Kahr's Control** .............15

      B. **A Design Which Allows the Disconnector Tab to be Damaged is Defective** ........................................................................25

**C.** **Because There is a Substantial Issue of Material Fact Regarding the Defect Involving the Inertial Trigger Pull, Charles Powell's Testimony Regarding that Defect Should Be Permitted**...............28

**CONCLUSION** ........................................................................29

**CERTIFICATE OF COMPLIANCE** ..............................................30

**CERTIFICATE OF SERVICE** .........................................................30

## TABLE OF AUTHORITIES

**Case:**                                                                                    **Page:**

Anderson v. Liberty Lobby, Inc.,
    477 U.S. 242 (1986)..........................................................................13

Casrell v. Altec Industries, Inc.,
    335 So. 2d 128 (Ala. 1976) ...........................................................15

Edmondson v. Velvet Lifestyles LLC,
    43 F. 4th 1153 (11th Cir. 2022)......................................................16

Endresen v. Scheels Hardware and Sports Shop, Inc.,
    560 N. W. 2d 225 (N. D. 1997).....................................................14

Entrekin v. Atlantic Richfield Co.,
    519 So. 2d 447 (Ala. 1987) ...........................................................15

Goree v. Winnebago Indus. Inc.,
    958 F. 2d 1537 (11th Cir. 1992)................................................16,17

Jefferson v. Sewon America, Inc.,
    891 F. 3d 911 (11th Cir. 2018).......................................................13

Nesbitt v. Candler County,
    945 F. 3d 1355 (11th Cir. 2020).....................................................13

**Rodgers v. AWB Industries, Inc.,
    762 Fed. App'x 1015 (11th Cir. 2019) ......................................22,23

**Seamon v. Remington Arms Co.,
    813 F. 3d 983 (11th Cir. 2016)............................... 23,24,25,27,28

Sears, Roebuck & Company, Inc. v. Haven Hills Farm, Inc.,
    395 So. 2d 991 (Ala. 1981) ...........................................................15

Verchot v. General Motors Corp.,
    812 So. 2d 296 (Ala. 2001) .......................................................................17

**Statute/Rule:**                                                          **Page:**

28 U.S.C. § 1291............................................................................. viii

28 U.S.C. § 1332(a) ........................................................................ viii

Fed. R. App. P. 4(a)(1)(A) .............................................................. viii

Fed. R. App. P. 26(a)(1)(C)............................................................. viii

Fed. R. App. P. 32(a)(5)....................................................................30

Fed. R. App. P. 32(a)(6)....................................................................30

Fed. R. App. P. 32(a)(7)....................................................................30

11th Cir. R. 26.1-1 ............................................................................ i

**Other Reference:**                                                        **Page:**

http://inchpro.com/conversion/14-points-to-inches/ ...............................10

## STATEMENT OF JURISDICTION

This court has jurisdiction pursuant to 28 U.S.C. § 1291. The case was originally filed in the United States District Court for the Northern District of Alabama, Northeastern Division, based on diversity jurisdiction under 28 U.S.C. § 1332(a). Doc. 1. Diversity jurisdiction exists because the Lyons are resident citizens of Alabama, and Saeilo, Inc. d//b/a Kahr Arms ("Kahr Arms") is a resident citizen of Pennsylvania by having its headquarters in Greeley, Pennsylvania and of Delaware by being incorporated under the laws of that State. Doc. 1, p. 3, ¶ 5.

Appellate jurisdiction exists under 28 U.S.C. § 1291 as an appeal from a final order below that ended the litigation on its merits by dismissing all parties' claims, in particular the Lyons' claims against Kahr Arms. The notice of appeal was timely filed. The order granting summary judgment on all claims against Kahr Arms was issued on March 31, 2023. Doc. 70. Thirty days after March 31, 2023 was April 30, 2023, a Sunday. Fed. R. App. P. 4(a)(1)(A) gives the appellants 30 days from the entry of the judgment to file their notice of appeal, while Fed. R. App. P. 26(a)(1)(C) provides that if the filing deadline falls on an intermediate Saturday, Sunday, or holiday, it will be extended to the next day on which the courthouse is open. In this case, April 30, 2023 was on a Sunday, and the notice of appeal was filed on the next day, May 1, 2023. Doc. 73. Accordingly, the notice of appeal was timely filed.

## STATEMENT OF THE ISSUES

1.    Does substantial evidence show that the Kahr Arm pistol is unreasonably dangerous under the Alabama Extended Manufacturer's Doctrine?

2.    Did the trial court err by excluding the testimony of Charles Powell regarding what it terms the "First Theory" of liability, i.e., that the Kahr firearm was unreasonably dangerous because when it is dropped, inertial energy causes the trigger to move and the striker block to move out of the way, which allows the gun to fire?

## STATEMENT OF THE CASE

### A.    Course of the Proceedings

This action was filed on January 12, 2021 in the United States District Court for the Northern District of Alabama, Northeastern Division, by Donald Lyons and Jillian Lyons against Saeilo, Inc. d/b/a Kahr Arms ("Kahr Arms").  Doc. 1, p. 1.  The complaint asked for compensatory and punitive damages to be awarded against Kahr based upon injuries Donald Lyons incurred in a "drop-fire" incident involving one of Kahr's firearm products, a 9 mm Kahr CW9 semi-automatic model pistol with serial number EE4752a.  Doc. 1, p. 1, ¶ 1.  The claims in the complaint were for negligence and wantonness, violation of the Alabama Extended Manufacturer's Liability Doctrine ("AEMLD"), breach of the implied warranty of merchantability, and a loss of consortium claim by Jilian Lyons.  Doc. 1, pp. 8, 10, 13, 14.

Discovery ensued.  On May 9, 2022, Kahr filed two motions, a motion for summary judgment with exhibits and a motion to exclude the Lyons' expert under Daubert.  Doc. 53, 54 and Doc. 5, respectively.  The Lyons filed a brief opposing the motion for summary judgment on June 10.  Doc. 59.  They filed their opposition to the Daubert motion the same day.  Doc. 60.  They also filed an evidentiary submission that applied to both of those motions.  Doc. 58, 58-1 through 58-6. On June 24, 2022, Kahr filed its reply briefs supporting both its Daubert motion and tis summary judgment motion.  Doc. 62 and 61 respectively.  A full evidentiary hearing

was held on the motions on February 9, 2023. Doc. 72. At the hearing, testimony was given by both Charles Powell, the Lyons' expert, and Gary Watkins, Kahr Arms' expert. Doc. 72, pp. 46-53, 54-72. The transcript of the hearing is part of the record. Doc. 72. Both the Lyons and Kahr submitted exhibits as part of the hearing. Doc. 66-1 through 66-12 and Doc. 67-1 through 67-31, respectively.

On March 31, 2023, an order and memorandum opinion was entered which denied Kahr's motion to exclude the Lyons' expert's testimony in part but which granted Kahr's motion for summary judgment. Doc. 70. A final judgment was also entered dismissing all the Lyons' claims against Kahr. Doc. 71. This appeal followed. Doc. 73.

The trial court's order was divided into two main parts: one discussing the motion to exclude the testimony of the Lyons' expert, Charles Powell, and one discussing the motion for summary judgment. In the expert section, the trial court divided the Plaintiff's theory into two parts, one based on the inertial trigger pull when the gun was dropped and the other based on the gun's failure to protect the disconnector tab from wear. Doc. 70, p. 15. The disconnector tab is part of what prevents the gun from firing until the trigger is pulled. Doc. 70, p. 15. Having done so, it then essentially granted summary judgment with respect to the first theory when it found that Powell's testimony regarding the "first theory" would not be helpful to the trier of fact because, it said, "the Theory is irrelevant to the underlying

3

dispute. If the CW9 pistol is dropped, regardless of whether inertial energy causes the trigger to move and the striker block to displace it is undisputed that such phenomenon *does not cause a drop-fire* because the sear will not release the striker, even upon impact with concrete." Doc. 70, p. 25. (Emphasis in original.) For reasons discussed below, substantial evidence refuted both conclusions by the trial court, requiring the claims against Kahr to be decided by a jury.

### B.    Statement of Facts

The facts relevant to this appeal include the description of the drop-fire incident that injured Donald Lyons, an explanation of how the Kahr firearm works, why it can accidentally fire when dropped, and how that renders the gun defective.

### 1.    The Incident

On July 2, 2019, Donald Lyons was accidentally shot in what is called a "drop-fire" incident. He owned a 9 mm Kahr CW9 semi-automatic pistol, serial number, EE4752, that he bought at an auction in 2019. Doc. 58-1, Dep. Lyons, p. 42. Mr. Lyons carried the gun with him in a holster when he would work in his yard, including on July 2, when he was mowing the grass. Id., p. 72. After he finished mowing the grass, he came back to the house, where his wife informed him that there was a snake in the basement. Id., p. 76. While attempting to remove the snake from the cement-floored basement, Lyons' pistol slipped out of its holster and struck the cement floor. Id., pp. 78-79. When it struck the cement floor, it fired, severely

injuring Mr. Lyons.  Id., pp. 78-79.    Kahr disputes that a drop-fire occurred, but there was substantial evidence to support the claim.  Mr. Lyons' testified that when he heard the gun shot on July 2, he saw a flash from the floor to his right.  Doc. 58-1, Dep. Lyons, p. 92:17-93:5.  The path of Mr. Lyons' wound was low to high, indicating a muzzle up drop of the pistol onto the rear top corner of the slide.  Doc. 58-5, Powell Report, p. 5, ¶¶ 6.7.  An examination of the pistol by Charles Powell, the Lyons' expert, showed that "the striker block contact surface from the subject pistol when initially examined on October 28, 2020 exhibited an impact mark showing that a past drop or sear cam release had allowed the striker to spring forward and impact the block contact surface without a trigger pull that would have moved the contact surface out of the way."  Id., ¶ 6.9.

It is undisputed that Donald Lyons' injuries were severe and were caused by the gun shot he suffered on July 2, 2019.

### 2.    A Description of the Kahr Firearm and Why It is Unsafe

The 9 mm Kahr CW9 pistol is a striker fired semi-automatic pistol.  A striker fired pistol fires through the action of a spring-loaded rod or cylinder, called a "striker" which replaces the hammer and firing pin in a traditional pistol.  Doc. 58-5, Powell Report, p. 3, ¶ 6.1.  When a striker-fired pistol is cocked, the striker is pulled back against spring pressure and held back by a fire control mechanism component.  Id.



*Gun Still 1  A Diagram of the Gun in the Cocked Position*[1]

Once the pistol's trigger is pulled, a fire control component releases the striker, which allows the striker to jump forward, impacting a bullet cartridge's primer and projecting the cartridge out of the gun.  Id.

---

[1] The above diagram is taken from a video which Kahr showed at the hearing.  Doc. 67-25.  The notations on the diagram are made by Lyons' counsel for illustrative purposes.  In addition, the contact tolerance/clearance referenced comes from Doc. 58-2, pp. 52-53.



*Gun Still 2The Gun About to Fire*

To prevent the pistol from firing unless the trigger is pulled, a cocking cam surface will hold the striker back. However, as the trigger is pulled, a cam in the pistol rotates, pulling the striker fully to the rear and simultaneously deactivating the safety block so that the striker be released to impact the bullet cartridge. Doc. 58-2, Dep. Moon(1), pp. 14-15; Doc. 58-5, Powell Report, p. 4, ¶ 6.3.

Once the gun is fired, the spring is completely released. However, because the gun is a semi-automatic, it immediately cycles past the fired stage and returns to the cocked position.



*Gun Still 3The Gun in the Uncocked Position Immediately After Firing*

The cocking cam is a device that depresses the internal safety block and interacts with the striker causing the gun to fire.  It, and the other internal components of the gun including the disconnector tab, are controlled by the trigger bar, which moves when the trigger moves.   In other words, the internal safety preventing the pistol from firing is deactivated by the motion of the trigger.

As Charles Powell, the Plaintiff's expert explained in his report:

The CW-9 does not have a traditional sear with a flat contact surface to engage the cocked striker lug but utilizes a cocking cam surface that holds the striker lug back and then pulls the lug further back as the trigger rotates this cam before finally releasing it. A second cam on the cocking cam shaft simultaneously raises a gate-type striker block to

8

allow the striker to spring forward when released by the sear cam. This Kahr model is advertised as a "Double-Action" pistol, but the pistol cannot be cocked by pulling the trigger as with a traditional double action pistol. After loading, the pistol slide must be pulled fully rearward to chamber a cartridge and partially pull the striker rearward. Subsequent trigger pulls to fire the pistol allow the rearward slide recoil to partially cock the striker after each discharge. When initially cocked, the striker is held rearward 0.45 from its rest position. As the pistol's trigger is pulled the scar cam rotates rearward and eventually pulls the striker back 0.543" before releasing it to spring forward. Even from its forward partly cocked position, the striker has enough energy to discharge a chambered cartridge if the internal safety block is not present to block it.

Doc. 58-5, Powell Report, p. 4, ¶ 6.3.

Unlike traditional double action pistols, the Kahr pistol cannot be fired and cocked simultaneously. Rather, after the pistol is loaded, the pistol slide must be pulled fully rearward to chamber a cartridge. When that is done, the striker, and the spring, are already compressed 75-80% towards the firing position. Doc. 58-2, Dep. Moon (1), 159-160. At cocking position, without the internal safety block, the striker would have enough energy to discharge the pistol. Id. From the cocked position, the gun can fire repeatedly when the trigger is pulled. To be fired, the trigger must move 0.543" from its rest position. Doc. 58-5, Powell Report, p. 4. The rest position is shown in the diagram "Gun Still 3" above. However, the action of cocking the pistol moves the striker 0.452" back from its rest position. Doc. 58-5, Powell Report, p. 4, ¶ 6.3. The diagram "Gun Still 1" depicts the gun in its cocked position. To fully release the striker to allow the gun to fire, the trigger only must

9

move an additional .091 inches.  Doc. 58-5, Powell Report, p. 4, ¶ 6.3.  To put that number in perspective, this brief is being written in Times New Roman 14 point type.    The   length   of   one   letter   of   14   point   type   is   .19   inches.  http://inchpro.com/conversion/14-points-to-inches/.  In other words, the distance the trigger needs to travel to fully release the striker is less than half of the length of one letter in this brief.

Remember, pulling the trigger is what makes the internal safety block move out of the way so that the pistol <u>can</u> fire, and pulling the trigger moves the disconnector tab as well.  Once the gun is cocked, the trigger only has to pull the striker block less than 5 or 10 percent of the remaining distance from the original resting position.  Doc. 58-2, Dep. Moon (1), pp. 159:-160.

Even Kahr's corporate representative admitted that when the pistol is dropped, the trigger moves.  Doc. 58-2, Dep. Moon (1), p. 47.  While Moon disagrees that the trigger can move enough to fire the gun without the trigger being pulled, Charles Powell's drop tests on an exemplar demonstrated that the trigger can move far enough to disengage the striker block when it is dropped.  Doc. 58-5, Powell Report, p. 4, ¶ 6.5.

The picture below shows the exemplar pistol immediately prior to impact with a concrete surface.  The top yellow mark is the normal position of the trigger and that is where the trigger is immediately prior to impact.



Doc. 58-5, Powell Report, p. 31, Photograph 16.

This next picture shows that at the moment of impact, the force of inertia has moved the trigger back to the bottom yellow mark, which is the position at which the striker block safety disengages, and the gun can, although it does not always, fire. This condition renders this pistol model defective and unreasonably dangerous.



11

Doc. 58-5, Powell Report, p. 31, Photograph 17.

The inertial energy imparted to the Kahr pistol when it is dropped is sufficient to make the trigger move to the point where the striker block safety no longer prevents the gun from firing. And when the trigger moves, the disconnector tab as well as the striker block safety moves.

### 3.    Evidence of Other Drop-Fires by Kahr Pistols

The trial court incorrectly implied that the Plaintiffs had not shown that the defect in the pistol from the movement of the trigger upon dropping caused the gun to discharge. Doc. 70, p. 27. While Mr. Powell's tests showed only one discharge, every single test showed that every time the pistol was dropped, the trigger moved into the fire position. Doc. 58-4, Dep. Powell, pp. 51, 111.

In addition, the Chief Executive Officer of Kahr, Justin Moon, testified that there were five other incidents involving individuals where claims were made against Kahr for drop-fire incidents. Doc. 58-2, Dep. Moon (1), p. 126-127. And a 2011 article from the New York Daily News which reported that officials in the New York City Police Department had instructed its police officers to stop carrying the Kahr K-9 semi-automatic pistol off-duty because there had been more than a dozen unintended discharges of the pistol. Doc. 58-2, Dep. Moon (1), p. 114-115, 118, 125-126; Doc. 58-6, New York Daily News Article. The article further stated that

the NYPD had stopped using the Kahr pistol as an on-duty weapon for the same reason five years earlier.  Doc. 58-6.

Substantial evidence showed that drop-fires have occurred in the Kahr pistols, and the testing by Powell showed the likely cause of such drop-fires.

### C.    The Standard of Review

The standard of review for summary judgment is well-settled.    Courts of Appeal review "an entry of summary judgment *de novo*, construing all facts and drawing all reasonable inferences in favor of the nonmoving party."  Jefferson v. Sewon America, Inc., 891 F. 3d 911, 918 (11th Cir. 2018).  "Summary judgment is proper 'if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Nesbitt v. Candler County, 945 F. 3d 1355, 1357 (11th Cir. 2020), quoting Fed. R. Civ. P. 56(a).  "At the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue of trial."  Nesbitt v. Candler County, 945 F. 3d 1355, 1357 (11th Cir. 2020), quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). "Because credibility determinations, the weighing of the evidence, and the drawing of legitimate

13

## SUMMARY OF THE ARGUMENT

The Kahr firearm was unreasonably dangerous when it left Kahr's control because every time the pistol is dropped, the striker-fire safety is disabled via inertial energy.  Doc. 58-4, Dep. Powell, pp. 51, 111.  Not only the striker-fire safety but also the disconnector tab are controlled by the trigger.  Pulling the trigger moves the trigger bar, which in turn rotates the cocking cam so that simultaneously the striker compresses the last little distance needed to fully compress the spring, the safety block is deactivated so that immediately upon full compression, the striker is released to impact the bullet cartridge and the disconnector tab moves out of the way to allow the gun to fire.  Doc. 58-2, Dep. Moon (1), pp. 14-15;  Doc. 58-5, Powell Report, p. 4, ¶ 6.3. The movements are not independent of one another.

The pistol was also unreasonably dangerous when it left Kahr's control because the design of the pistol allows the disconnector tab, another safety feature of the pistol, to be damaged.  The design of the disconnector tab and its location on the Kahr model pistols is defective in that it allows mechanical damage and frictional contact with the slide during movement.  Doc. 58-5, Powell Report, p. 5, ¶ 6.8.

## ARGUMENT

The consequences of a defective handgun can be deadly.  Because of this danger, "manufacturers of hand guns have been held to the most exacting duty of care in the design of their product." Endresen v. Scheels Hardware and Sports Shop,

14

Inc., 560 N. W. 2d 225, 234 (N. D. 1997). Whether an owner chooses to use a handgun for personal protection, sport, target practice, competition or as a collectible, they should be able to trust that their gun will shoot when, and only when, they intentionally pull the trigger to make it shoot. The gun company that breaches that trust, as Kahr has, should be forced to face the consequences of that breach. With substantial evidence that the Kahr 9 mm CW9 semi-automatic model pistol was unreasonably dangerous as designed, this case should not have been taken from the jury. The trial court erred in granting summary judgment.

## A.   THERE IS SUBSTANTIAL EVIDENCE THAT THE KAHR PISTOL WAS UNREASONABLY DANGEROUS WHEN IT LEFT KAHR'S CONTROL

To prevail in a claim under the Alabama Extended Manufacturer's Liability Doctrine, a plaintiff must show that the product is in a defective condition that is unreasonably dangerous. Entrekin v. Atlantic Richfield Co., 519 So. 2d 447, 449 (Ala. 1987). Whether a product is unreasonably dangerous is normally an issue for the trier of fact. Id. at 449. However, "proof of the specific defect, i.e., the exact act, omission, process, construction, etc. resulting in the product's failing its intended use is not required." Sears, Roebuck & Company, Inc. v. Haven Hills Farm, Inc., 395 So. 2d 991, 994 (Ala. 1981). "If a product is unreasonably dangerous, it is necessarily defective and the consumer should not be required to prove defectiveness as a separate matter." Casrell v. Altec Industries, Inc., 335 So.

15

2d 128, 131 (Ala. 1976). *See also*, <u>Goree v. Winnebago Indus. Inc.</u>, 958 F. 2d 1537, 1541 (11th Cir. 1992) ("A plaintiff does not have to establish the specific defect that caused his injury, only that the product was unreasonably dangerous.").

The trial court's order depended upon its misunderstanding of the proof of the defect. As did Kahr, the trial court focused exclusively on whether the exemplar guns dropped by Charles Powell actually fired while ignoring the fact that <u>every</u> drop showed the striker-fire safety was disabled due to inertial energy on the trigger from the drop, meaning the gun <u>could have</u> fired. In addition, the trial court ignored the prohibition against making its own findings of fact when disputed issues should be left to the jury.

> 'Summary judgment is a lethal weapon, and courts must be mindful of its aims and targets and beware of overkill in its use.' … At summary judgment, 'the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.' … A genuine issue of material fact exists 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.' … So a claim should go to trial if 'there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.'

<u>Edmondson v. Velvet Lifestyles LLC</u>, 43 F. 4th 1153, 1159 (11th Cir. 2022).

Powell's opinions are helpful to the trier of fact because Powell's opinion show two specific defects which make the gun reasonably dangerous. These defects are 1) the movement of the trigger into the firing zone when the gun is dropped and

2) the design of the gun which permits the disconnector tab to be damaged over the course of the use of the gun.

Under the AEMLD, however, the plaintiff is not required to identify a specific defect in the product. <u>Goree v. Winnebago Indus., Inc.</u>, 958 f. 2d 1537, 1541 (11th Cir. 1992). Rather, a plaintiff must establish "only that the product was unreasonably dangerous." <u>Id.</u> at 1541. The plaintiff must show that the product's failure is causally related in fact to the product's defective condition at the time of sale. <u>Verchot v. General Motors Corp.</u>, 812 So. 2d 296, 301 (Ala. 2001). This includes "proof that the defect caused the injury and that the defect is traceable to the Defendant." <u>Id.</u>

Powell's report and opinions help establish that the gun was unreasonably dangerous because it had a defect. In this case, one defect is the fact that inertial energy can cause the trigger to move when the pistol is dropped to the point where the striker block safety no longer prevents the pistol from firing. As Kahr's corporate representative himself admitted, it is both foreseeable to Kahr that someone could drop a loaded pistol, and that a pistol that could fire when it is dropped is unreasonably dangerous. Doc. 58-3, Dep. Moon(3), pp. 14-17, 19.

The trial judge essentially granted summary judgment on the "first theory" because it held "if the CW9 is dropped, regardless of whether inertial energy causes the trigger to move and the striker block to displace, it is undisputed that such

phenomenon *does not cause a drop-fire* because the sear will not release the striker, even upon impact with concrete…During his deposition, Mr. Powell testified *repeatedly* that even if the striker block is displaced because of trigger movement during a drop, for the CW9 pistol to discharge on impact, the trigger must have already been partially pulled (i.e., the Second Theory must be in effect)." Doc. 70, pp. 25-26.

However, an examination of Mr. Powell's testimony cited by the court as supporting this statement shows that the court must have misunderstood what Powell said. For example, at Doc. 51-10, p. 30, Powell's testimony was:

> …[**T**]**he drop fire testing shows that the only safety mechanism on the pistol, which is the passive striker block safety, is negated when the inertial forces move the trigger.** Given that, the pistol could fire if there's no safety block on the striker bar, but on this pistol [the exemplar pistol], it needed an additional element of the partial pulling of the trigger by the movement of the disconnector tab in order to fire during a drop.

Doc. 51-10, p. 30 (111:8-17). (Emphasis added.)

> Q.    Does all that lead to your conclusion that the Kahr pistol, this CW9, the one that you tested and that everyone else tested will not drop-fire, but for, in your opinion, the damage that you saw?
>
> A.    As I stated in my report, **it will negate the safety**, but it did not, **in my testing**, drop-fire unless you negate the trigger.

Doc. 51-10, p. 30 (112:11-19). (Emphasis added.)

As this testimony shows, Mr. Powell was quite clear that the internal trigger safety stopped working when the gun was dropped, which allows the gun to fire. It

18

is <u>more likely</u> to fire if the disconnector tab is damaged as well, which showed in his own testing of the exemplar, but the gun can, and sometimes will, fire when it is dropped solely due to the inertial trigger pull.

The judge's statement that "if the CW9 is dropped, regardless of whether inertial energy causes the trigger to move and the striker block to displace, it is undisputed that such phenomenon does not cause a drop-fire because the sear will not release the striker, even upon impact with concrete" is also incorrect.  Doc. 70, pp. 25-26.  As pointed out earlier, once the gun has been cocked, <u>the only other action needed for it to fire is pulling the trigger.</u>  The cocking of the gun occurs when the gun is "racked," that is, when the back part of the gun is pulled to the rear and then moves forward on its own.  At that point, there is a bullet in the chamber of the gun, it is loaded and if the trigger is pulled, <u>the gun will fire</u>.  Pulling the trigger moves the trigger bar, which in turn rotates the cocking cam so that <u>simultaneously</u> the striker compresses the last little distance needed to fully compress the spring, the safety block is deactivated so that immediately upon full compression, the striker is released to impact the bullet cartridge and the disconnector tab moves out of the way to allow the gun to fire.  Doc. 58-2, Dep. Moon (1), pp. 14-15;  Doc. 58-5, Powell Report, p. 4, ¶ 6.3.  These movements are not independent of one another.  If the trigger moves, the cocking cam moves, the spring compresses and the striker block/sear/cocking cam moves out of the way so the gun can fire.

19

Charles Powell also testified at the summary judgment/Daubert hearing held

on February 9, 2023.  There he explained the following:

> This pistol has two defects in it that was present at the time the pistol
> was manufactured. It has an internal safety called a striker safety that is
> released when the trigger moves. An inertial force that's created when
> a pistol is dropped removes that safety from the path of the striker and
> allows the striker -- can allow the striker to come forward, so that safety
> is no longer present, **and the pistol can fire if the striker is released**.
> The second defect is the lack of protection of the large disconnector tab
> on the side. Movement of the slide or any kind of debris that gets into
> that cavity pulls the disconnector tab forward, which moves the trigger
> to the rearward. Had this pistol had a trigger safety on it, the trigger
> could not have moved from an inertial force, and it could not have
> moved from movement of the disconnector tab because the trigger
> safety would have prevented it.

Doc. 72, pp. 47-48.  (Emphasis added.)

> Q.      And isn't it true if the pistol is dropped and the trigger
>         moves due to inertia, then the striker-block safety is
>         defeated?
>
> A.      That's correct.
>
> Q.      And the weapon can fire?
>
> A.      It can fire, yes, sir.

Id., p. 49.

Further, in his report, Powell also explained that the defect caused the drop-

fire incident injuring Lyons as follows:

> As shown in Photograph 14, the striker block contact surface from the
> subject pistol when initially examined on October 28, 2020, exhibited
> an impact mark showing that a past drop or sear cam release had
> allowed the striker to spring forward and impact the block contact

20

surface without a trigger pull that would have moved this contact surface out of the way.

Doc. 58-5, Powell Report, p. 5, ¶ 6.9.

Equally telling is the testimony of the defendant's expert, Derek Watkins. His testimony does not preclude the two defects above from having caused the drop-fire that injured Mr. Lyons.  Watkins assumed that because the gun he (Mr. Watkins) tested "never went off," there was no evidence that the disconnector tab had moved. Doc. 72, p. 69.  But, again, if the trigger moves, the cocking cam moves, and the disconnector tab moves.  Accordingly, simply because Watkins' gun never went off does not mean that the pistol design itself is not unreasonably dangerous.

The trial court's order ignored the evidence in the Lyon's summary judgment opposition that there was evidence tending to show that the trigger safety design in the CW9 and other Kahr pistols with similar internal workings were subject to drop fires.  (Over 650,000 Kahr pistols share the same striker block safety mechanism as the pistol in this case.  Doc. 58-2, p. Dep. Moon(1), p. 29.)  The Chief Executive Officer of Kahr, Justin Moon, testified there were five other claims made against Kahr for drop-fire incidents.  Doc. 58-2, Dep. Moon (1), p. 126 -127.  And a 2011 article from the New York Daily News reported that officials in the New York City Police Department had instructed its police officers to stop carrying the Kahr K-9 semi-automatic pistol off-duty because there had been more than a dozen unintended discharges of the pistol.  Doc. 58-2, Dep. Moon (1), p. 114-115, 118, 125-126; Doc.

58-6, New York Daily News Article. The article further stated that the NYPD had stopped using the Kahr pistol as an on-duty weapon for the same reason five years earlier.

In the case of <u>Rodgers v. AWB Industries, Inc.</u>, 762 Fed. App'x 1015 (11th Cir. 2019), the 11th Circuit had to decide whether a product liability injury to a plaintiff due to couplings on an air compression tester and connector for airplanes was foreseeable. The 11th Circuit found the following sufficient to show foreseeability under Alabama law:

1.      A 2006 article from an online aviation website shared a safety tip from an airframe shop manager about using unique couplings on the compression test adapter the shop used because "that way, it is virtually impossible to connect it to the unregulated shop air." <u>Rodgers</u>, 762 Fed. App'x at 1024.

2.      The plaintiff's human error expert witness testified that "even a cursory examination of potential human errors in the use of the tester and extension would identify the admission of unregulated, high-pressure air into the cylinder under test as a critique error, in that it could lead to immediate injury…" <u>Id.</u>

3.      The defendant's expert witness "stated he had heard discussion about the potential for mechanics to accidentally put shop air directly into a cylinder while intending to connect the Tester although he had never heard of such incident actually occurring." <u>Id.</u>

Thus, the 11th Circuit concluded "at least some people in the industry knew the standard design of differential pressure testers and pressure tester extensions allowed air to be inserted directly into the engine cylinder and that such a connection could result in serious injury." Id. at 1024-1025.

Similarly, in the instant case, the Lyons have shown substantial evidence that the inertial trigger pull defect caused the injuries to Mr. Lyons. There is evidence 1) that Mr. Lyons himself was injured as a result of a drop-fire, 2) Kahr was aware of at least five other claims made against it alleging drop-fires, and 3) the New York City Police Department had both stopped using its pistols as official weapons and instructed its officers to not use Kahr pistols even for their own person use due to drop-fires.

The case of Seamon v. Remington Arms Co., 813 F. 3d 983 (11th Cir. 2016) is instructive. In that case, Kenneth Seamon went deer hunting alone in Autauga County, Alabama. He was found later that day dead in his elevated tree stand with a single gunshot wound to his chest. His widow filed suit under the Alabama Extended Manufacturer's Liability Doctrine against Remington Arms Co., claiming that the rifle fired inadvertently, killing her husband. The trial court granted summary judgment on the basis that the testimony of Seamon's firearms expert (the same expert as in this case) was unreliable. The 11th Circuit disagreed.

23

In doing so, it first noted that there was evidence from which a jury could find that the rifle inadvertently fired when it bumped into an object, causing Seamon to be shot and killed. Seamon, 813 F. 3d at 990. In the instant case, as discussed previously in this brief, there is also evidence from a jury could find that Lyons' pistol drop-fired, causing his injuries.

It then discussed Powell's opinion that debris in the fire control housing of the rifle created a condition that allowed the rifle to inadvertently fire. In doing so, it noted that the connection in the rifle between its "connector" and "sear" was "less than 1/40[th] of an inch," or "roughly .025" inches. Seamon, 813 F. 3d at 986. The connection in the instant case between the cocking cam and the trigger bar is similarly miniscule, between .01 and .08". Doc. 58-2, Dep. Moon(1), pp. 50-52. In the rifle, "interferences" between the connector and sear were caused by items such as "dirt, corrosion deposits, condensation, frozen moisture, lubricant deposits, firing deposits, and manufacturing residue." Seamon, 813 F. 3d at 986-987. The 11th Circuit also observed the following:

> What Powell actually testified to is that he has never seen this condition in a Model 700 accident rifle—that is, a rifle that has allegedly fired without a pull of the trigger—because by the time he receives an accident rifle for examination, the debris or deposits that would have interfered with the sear's position have necessarily been dislodged through the firing of the rifle. Powell did state that he has observed interferences creating low sear engagements in non-accident rifles with Walker trigger systems.

Seamon, 813 F. 3d at 991.

24

The 11th Circuit held that Powell's testimony in this regard was sufficiently reliable to show a design defect in the rifle, and reversed both the exclusion of Powell's testimony and the summary judgment granted against the Seamons.

Similarly in the instant case, Powell did not testify that any of the guns that he tested discharged, except for the one test where he attempted to replicate the exact condition of the Lyons' pistol. However, he did state consistently that every time the exemplar Kahr pistol was dropped, the trigger moved into the range where it could cause the gun to fire. Doc. 58-4, Dep. Powell, pp. 51, 111. Accordingly, this testimony should be sufficient to show a design defect regarding the inertial trigger pull, and the summary judgment should be reversed.

The evidence shows that the inertial trigger pull was a safety defect that was a proximate cause of Mr. Lyons' injuries. Accordingly, the order granting summary judgment should be reversed and the case remanded for trial.

**B.     A DESIGN WHICH ALLOWS THE DISCONNECTOR TAB TO BE DAMAGED IS DEFECTIVE**

In granting summary judgment on what it terms the "second theory," the trial court also erred. The trial judge articulated the "second theory" as "the lack of protection of the disconnector tab wherein the slide or debris in that cavity can move the tab forward, causing a partial trigger pull." Doc. 70, p. 15. He then further broke it down into two causation hypotheses:  1)  the incident occurred because there was debris or foreign material within the cavity where the disconnector tab sits that

helped the tab and trigger bar forward and caused a partial trigger pull; or 2) due to the damage on the disconnector tab caused by debris of foreign material, there was enough contact between the tab and the slide to hold the tab and trigger bar forward causing a partial trigger pull.  <u>Id.</u>, p. 15.  He then concluded in his order that because the Plaintiff could not show that the subject pistol was in a defective condition when it left Kahr's control in 2010 – i.e., there was no damage to the disconnector tab when the gun left the factory – the motion for summary judgment must be granted. <u>Id.</u> p. 36.  His decision misses the key point of the disconnector tab defect.  The fact that the disconnector tab is placed into the gun in such a way that it <u>can</u> be damaged is the defect.  That is, every Kahr gun with a similar disconnector tab design is defective because it was not placed into the gun in such a manner as to <u>protect it from</u> suffering damage.  This defect is doubly dangerous in light of the inertial trigger pull defect already discussed.

Charles Powell explained this defect in the following manner in his report:

The striker lug released from the sear cam on the subject pistol as a result of frame flex and separation of the components during impact. The subject pistol has a raised tab on its trigger bar component that is pushed by the slides lower edge as the slide moves rearward and forward after pistol discharge. This is a common disconnect design in striker fired pistol designs. The push downward by the slide movement disconnects the trigger from the cocking cam while the slide is out of battery. When the disconnect tab raises up into a cut-out on the pistol slide when the slide returns to battery the trigger bar reconnects with the cocking cam and the trigger can again be used to discharge the pistol. This action prevents an out of battery discharge or potential multiple discharges. On the subject pistol, the disconnector tab has been

deformed and contacted on its side as a result of slide movement during the life of the pistol (Photographs 9 and 10). This disconnector tab on a Kahr pistol should never be significantly contacted on its side from slide movement. As the slide closes, frictional contact can drag the disconnector tab forward and partially pull the pistol's trigger. This greatly reduces the amount frame flex or impact force to release the striker lug from the cocking cam. The design of the disconnector tab and its location on the Kahr model pistols is defective in that it allows mechanical damage and frictional contact with the slide during movement. When the disconnector is dragged forward, the energy to discharge the pistol is reduced by 92 percent.

Doc. 58-5, Powell Report, p.5, ¶ 6.8.

As noted earlier, the interaction between the cocking cam and the striker block are razor thin, between .01 and .08 inches, less than ½ of the length of one letter of the type used to write this brief. The defect is not the presence of foreign matter in the pistol, but the fact that the disconnector tab is designed in such a position that wear and tear damage and the intrusion of foreign matter interferes with the normal tolerances that allow the disconnector tab to prevent the gun from firing. Thus, the defect existed when the gun left the factory, and the summary judgment in this regard should be overturned as well.

The Seamon case is again instructive. In that case, it was undisputed that the debris which could interfere with the connector-sear interface was not present when the rifle was manufactured. Instead, the debris accumulated or was acquired after the rifle was purchased and being used. Yet the 11th Circuit found that a jury

question existed because the rifle was designed in such a manner as to allow that type of wear and tear in the rifle.  Seamon, 813 F. 3d at 990-991.

Similarly, in the instant case, allowing the disconnector tab to move in a direction which increases the likelihood of wear and tear damage to the tab is a design defect because such damage makes the gun even more likely to fire when dropped then it would be otherwise.  Accordingly, the trial court should not have granted summary judgment on this issue either.

As these arguments show, substantial evidence shows that a drop-fire incident caused Mr. Lyon's injuries and that there were two defects in the gun, either one of which would have been sufficient to cause the gun to fire.  Accordingly, the trial court invaded the purview of the jury when it granted summary judgment, and his ruling should be reversed.

### C.    BECAUSE THERE IS A SUBSTANTIAL ISSUE OF MATERIAL FACT REGARDING THE DEFECT INVOLVING THE INERTIAL TRIGGER PULL, CHARLES POWELL'S TESTIMONY REGARDING THAT DEFECT SHOULD BE PERMITTED.

In its Daubert ruling, the trial court held that Charles Powell's testimony regarding the inertial trigger pull defect, i.e., Theory One, was not helpful to the trier of fact because it held, "if the CW9 pistol is dropped, regardless of whether inertial energy causes the trigger to move and the striker block to displace it is undisputed that such phenomenon *does not cause a drop-fire* because the sear will not release the striker, even upon impact with concrete."  Doc. 70, p. 25.  As shown in the

preceding section, the question of whether the inertial trigger pull caused the gun to fire is a question for the trier of fact.  Accordingly, Charles Powell's testimony in this regard is helpful to the trier of fact, and it should be admitted.

## CONCLUSION

Because substantial evidence existed that the gun was defective and the defect caused Donald Lyons' injuries, the Lyons respectfully request that the trial court's order granting summary judgment be reversed and the case remanded to allow all claims to be decided by a jury.

Respectfully submitted on this the 28th day of July 2023.


*/s/*    M. Todd Wheeles
M. Todd Wheeles
Counsel for the Lyons

**OF COUNSEL:**

Mr. M. Todd Wheeles
Mr. Matthew Garmon
Ms. Nancy L. Eady
**MORRIS, HAYNES, WHEELES, KNOWLES & NELSON**
3500 Blue Lake Drive, Suite 200
Birmingham, Alabama 35243
Telephone:  (205) 324-4008
Facsimile:   (205) 324-0803
Email:       twhelles@mhhlaw.net
             mgarmon@mhhlaw.net
             neady@mhhlaw.net

## **CERTIFICATE OF COMPLIANCE**

Undersigned counsel certifies that this brief complies with the limitations set forth in Fed. R. App. P. 32(a)(7) and the type-volume limitation.  This document also complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in times New Roman 14. This brief contains 7922 words.

/s/    *M. Todd Wheeles*
Of Counsel

## **CERTIFICATE OF SERVICE**

I hereby certify that I have on this the **28th** day of **July, 2023**, electronically filed the above and foregoing with the Clerk of Court for the Eleventh Circuit using the CM/ECF system.

/s/ *M. Todd Wheeles*
Of Counsel

30